

SO ORDERED,

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: January 8, 2019**

**The Order of the Court is set forth below. The docket reflects the date entered.**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **DELTA INVESTMENTS & DEVELOPMENT, LLC,** | **CASE NO. 12-01160-NPO** |
| **DEBTOR.** | **CHAPTER 7** |
| **J. STEPHEN SMITH, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF DELTA INVESTMENTS & DEVELOPMENT, LLC** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 17-00067-NPO** |
| **GARY WILBURN, RICK TAYLOR, JANE SEARS, AND DJJ&J ENTERPRISES, LLC** | **DEFENDANTS** |

### (I) MEMORANDUM OPINION AND ORDER ON COUNT IV: VIOLATION OF THE AUTOMATIC STAY AND (II) PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON: (A) COUNT I: PIERCING THE VEIL AND (B) COUNT II: BREACH OF DUTY-OFFICERS AND DIRECTORS

This matter came before the Court for trial on November 28-29, 2018 (the "Trial"), on the

Complaint (the "Complaint") (Adv. Dkt. 1)[1] filed by J. Stephen Smith (the "Trustee") in his

---

[1] Citations to docket entries in the above-referenced adversary (the "Adversary") are cited as "(Adv. Dkt. ____)"; citations to docket entries in the above-referenced bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. ____)".

capacity as the chapter 7 trustee for the bankruptcy estate of Delta Investments & Development, LLC ("Delta") and the Answer and Affirmative Defenses (the "Answer") (Adv. Dkt. 36) filed by Gary Wilburn ("Wilburn"), Rick Taylor ("Taylor"), Jane Sears ("Jane Sears"), and DJJ&J Enterprises, Inc. ("DJJ&J") (collectively, the "Defendants") in the Adversary.  The Trustee filed the Plaintiff's Trial Brief (Adv. Dkt. 51) on November 23, 2018; the Defendants chose not to file a pre-Trial brief.  The Revised Pretrial Order (the "PTO") (Adv. Dkt. 53) was entered on November 28, 2018.

At Trial, the Trustee was represented by Lawrence Deas and William Liston; the Defendants were represented by Penny B. Lawson and Harry P. Long.  Five witnesses testified at Trial, including Taylor, Wilburn, Doug Sears ("Doug Sears"), the Trustee, and David Porter ("Porter").  By stipulation, 25 joint exhibits were admitted into evidence at Trial;[2] the Trustee introduced 19 exhibits; and the Defendants introduced 21 exhibits.[3]  At the end of Trial, the Court invited the parties to submit letter briefs addressing the *Barton* doctrine.  *See Barton v. Barbour*, 104 U.S. 126 (1881).  Neither party filed a post-Trial brief.

### Introduction

This Adversary flows from the shared dream of three life-long friends to own and operate a casino.  In their quest to purchase the Horizon Hotel and Casino in Vicksburg, Mississippi, at a bargain price, they were undeterred by legal barriers and delayed financing.  To overcome these obstacles, they enlisted the help of others they knew from their operation of bingo and sweepstakes parlors in Alabama to form two corporations, one to operate the casino and the other to manage

---

[2] There are only twenty-five (25) joint exhibits though they are marked "J-1" through "J-26"; the joint exhibit marked as "J-14" is a duplicate of the joint exhibit marked as "J-12".

[3] The joint exhibits are cited as "(Jt. Ex. #)"; the exhibits introduced into evidence by the Trustee are cited as "(Tr. Ex. #)"; and the exhibits introduced into evidence by the Defendants are cited as "(Defs. Ex. #)".

the hotel.  Despite their machinations, the project was beset by bad luck from the start.  Ultimately, Great Southern Investment Group, Inc. ("Great Southern"), the owner of the hotel, abandoned the project entirely, and Delta, the owner of the casino, filed bankruptcy.  This Adversary is just one of many lawsuits arising out of the multiple subterfuges of the Defendants and others.  Here, the Trustee asserts claims against the former shareholders of Great Southern and DJJ&J who he alleges drained the coffers of Great Southern's bank account.

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  Notice of the Trial was proper under the circumstances.  This Adversary includes one core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), and two non-core proceedings.  The constitutional authority of the Court to enter a final judgment in the two non-core proceedings has been challenged by the Defendants and is addressed in more detail below.

## Facts[4]

To provide context to the Trustee's claims in the Adversary, some background information is necessary regarding Mississippi's gaming statutes and regulations and the location and design of the hotel and gaming facilities in question.

**Riverboat Gaming in Mississippi**

In 1990, the Mississippi Legislature legalized dockside gaming, subject to local referenda, along the Mississippi River and coastal counties.  MISS. CODE ANN. § 97-33-25.  To protect the public from "rigged" or otherwise unfair gaming and to ensure public trust in the gaming industry,

---

[4] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

the Mississippi Legislature also enacted the Mississippi Gaming Act, MISS. CODE ANN. § 75-76-1 *et seq.*, modeled after Nevada's gambling control laws.

The Mississippi Gaming Act bestows upon the Mississippi Gaming Commission (the "Commission") responsibility for maintaining public confidence in the gaming industry as well as protecting the public's welfare.[5] MISS. CODE ANN. § 75-76-3(3), -27. The Mississippi Gaming Act requires the owner of a casino to obtain a license, MISS. CODE ANN. § 75-76-55, and grants the Commission the "absolute power and authority" to issue, deny, limit, condition, restrict, and revoke the license. MISS. CODE ANN. § 75-76-29(3).

Before issuing a license, the Commission must find that the financing of the operation is adequate and from a suitable source. MISS. CODE ANN. § 75-76-67. To that end, the Mississippi Gaming Act requires that any corporation applying for a gaming license provide information that includes the financial structure and nature of the business to be operated and the terms and conditions of all outstanding indebtedness. MISS. CODE ANN. § 75-76-209. Also, as part of the licensing process, the Mississippi Gaming Act requires the Commission to investigate the "suitability" of individuals who have significant influence over the proposed gaming operation. MISS. CODE ANN. § 75-76-63. Generally, the officers and directors of any corporation that applies for a state gaming license must be licensed individually and shareholders who are actively and directly engaged in the administration or supervision of gaming, or who have any other significant involvement with the licensee, must be found suitable and may be required to be licensed. MISS. CODE ANN. § 75-76-211. This finding of suitability is comparable to licensing, and both require submission of detailed personal financial information followed by an investigation.

---

[5] The Commission was formed in 1993 and took over the primary role of regulating the casino industry from the Mississippi State Tax Commission. MISS. CODE ANN. § 75-76-7(2).

A primary objective of the Mississippi Gaming Act's suitability investigation is to uncover any criminal connections, particularly any connections to organized crime. Accordingly, the Mississippi Gaming Act expressly prohibits the Commission from finding suitable any person who has been convicted of a felony in any court of Mississippi, another state, or the United States; a crime in another state which would be a felony in Mississippi; or a misdemeanor involving gambling, sale of alcoholic beverages to minors, prostitution, or procuring individuals to engage in prostitution. MISS. CODE ANN. § 75-76-67(3).

**Hotel and Casino:  Harrah's and Horizon**

In 1993, Harrah's Vicksburg Corporation ("Harrah's"), a Nevada corporation, acquired property located in the City of Vicksburg on the Yazoo Diversion Canal (near the Mississippi River) to construct a hotel and casino, which it named Harrah's Vicksburg Hotel and Casino. Harrah's constructed a cofferdam in the Yazoo Diversion Canal in which to float the Star of Vicksburg, a vessel resembling a paddle-wheel riverboat.[6] Harrah's also built a 117-room hotel located on the other side of the flood wall directly across from the riverboat. Harrah's Vicksburg Hotel was connected by a walkway over Levee Street to a building that contained three restaurants for hotel and casino patrons. That building was connected to the riverboat casino by a gangplank. Access to Harrah's Vicksburg Casino thus required patrons to enter and walk through Harrah's

---

[6] When first enacted, the Mississippi Gaming Act legalized gambling on a "vessel" or "cruise vessel" that lies in the waters south of the three coastal counties, or on the Mississippi River or its navigable waters but did not require the vessel to cruise. MISS. CODE ANN. § 97-33-25 (1990). Some casino operators moored large barges into approved gaming sites and built on top of these barges casino facilities that replicated the paddle-wheel, steam-engine riverboats (also known as showboats) that cruised the Mississippi River in the Nineteenth Century. The riverboat design of gaming facilities gradually faded as casinos became more fully integrated into land-based restaurants and entertainment venues. Also, after Hurricane Katrina destroyed all floating casinos along the Mississippi Gulf Coast in 2005, the Mississippi Legislature amended the Mississippi Gaming Act to legalize shore-based gaming in the coastal counties. MISS. CODE ANN. § 97-33-25(b) (2018).

Vicksburg Hotel.  On October 23, 2008, Harrah's conveyed the Harrah's Vicksburg Hotel and Casino to Columbia Properties Vicksburg, LLC ("Columbia").  Columbia renamed the property the Horizon Hotel and Casino.[7]

**Project Investors, Hotel Investors & Casino Investors**

In early 2010, Stephen Haynes ("Haynes") contacted Taylor about forming a group of investors to buy the Horizon Hotel and Casino.  Haynes and Taylor were partners in a sweepstakes business in Alabama.  (Jt. Ex. 25 at 20).[8]  Eventually, Taylor assembled an investment group that included himself, Haynes, Doug Sears (the spouse of Jane Sears), Wilburn, Bob Mosley ("Mosley"), Michael Caldwell ("Caldwell"), and Michael Sullivan ("Sullivan") (collectively, the "Project Investors") to pursue the purchase of the Horizon Hotel and Casino (the "Casino Project").  (Stip. #6, 7).  Taylor, Wilburn, and Doug Sears are life-long friends who had joint business interests in sweepstakes and bingo parlors in Alabama.  (Trial at 1:14:44-1:15:05) (Nov. 28, 2018).[9]  Jane Sears became involved in the Casino Project through her husband, Doug Sears.  (Trial at 2:17:26-2:17:48) (Nov. 28, 2018).  Taylor knew Mosely because he had purchased promotional and bingo software from his companies.  (Jt. Ex. 23 at 37-38; Jt. Ex. 25 at 22).  Mosley is Caldwell's father-in-law.  (Jt. Ex. 25 at 35-36).  Sullivan was a lobbyist in Alabama with important contacts in the gaming industry.  (*Id.* at 23).

---

[7] The above facts are provided for informational and contextual purposes only.  The relevant facts developed at Trial continue from this point forward.  Many of these same facts were stipulated and agreed to in the PTO.  The stipulated facts in the PTO are cited by numbered paragraph as "(Stip. #__)".

[8] In some of the deposition transcripts, four pages of the original transcript appear on a single page.  For clarity, citations to the deposition transcripts are to the original page numbers.

[9] The Trial was not transcribed.  Citations are to the time-stamp of the audio recording followed by the date.

The Project Investors initially agreed that Taylor, Jane Sears, Wilburn, and Caldwell would each contribute twenty percent (20%) of the needed funds and own twenty percent (20%) of the investment. (Stip. #8). Of the remaining twenty percent (20%), they agreed to divide fifteen percent (15%) between Haynes and Sullivan, and to leave five percent (5%) unassigned. (Stip. #9). Mosley had an informal arrangement with Caldwell to share his twenty percent (20%) interest in the Casino Project. (Jt. Ex. 25 at 35, 38). The Project Investors never formed a legal entity and never entered into a formal written agreement delineating their interests in the Casino Project. (Jt. Ex. 21 at 49-50).

Negotiations to purchase the Horizon Hotel and Casino began in June 2010. The Project Investors intended to contribute money towards the purchase in amounts consistent with the percentages to which they had previously agreed except that Haynes would contribute eight percent (8%) of the needed funds and own fifteen percent (15%) of the investment, with seven percent (7%) considered to be a finder's fee, and Sullivan would contribute no funds and own five percent (5%) of the investment for his efforts in putting the deal together. (Jt. Ex. 21 at 36; Jt. Ex. 25 at 33). The Project Investors hoped to fund the purchase of the Horizon Hotel and Casino in part with a loan from Bally Gaming, Inc. ("Bally"), a Nevada corporation, with Sullivan spearheading that effort. Sullivan was a lobbyist for Bally in Alabama and a close business associate of Bally's chief financial officer. To a lesser extent, Caldwell and Taylor also were involved in loan negotiations with Bally. (Jt. Ex. 25 at 55-58).

**Mississippi Gaming Act's Suitability Requirements**

At some point, Taylor, Wilburn, and Doug Sears learned that Mississippi law prohibited them from owning any interest in a casino. (Stip. #10; Jt. Ex. 21 at 22-23). Both Taylor and Wilburn had prior misdemeanor gaming convictions in Alabama involving bingo machines, and

Doug Sears had a felony conviction in Florida.  (Stip. #10; Jt. Ex. 21 at 40; Jt. Ex. 25 at 32).  Additionally, Jane Sears was not willing to provide the financial information necessary to qualify for casino ownership.  (Stip. #10).  Mosley also could not meet the suitability requirements though for reasons not disclosed at Trial.  (Jt. Ex. 25 at 36-37).  Instead of abandoning the Casino Project, the Project Investors decided to move forward with the investment by forming two corporations, Delta and Great Southern.  (Jt. Ex. 21 at 24-25).  They agreed that those Project Investors who could satisfy the suitability requirements would own Delta, that Delta would buy the Horizon Hotel and Casino, and that Delta would sell the Horizon Hotel and other shore-side assets to Great Southern, which would be owned by those Project Investors who could not satisfy the suitability requirements.  (*Id.*).

**Delta**

Caldwell and Haynes, who already held gaming licenses in other jurisdictions formed Delta (Stip. #11; Jt. Ex. 23 at 45) under the laws of Nevada (Jt. Ex. 21 at 32) to purchase the Horizon Hotel and Casino.  Caldwell held the majority interest.  (Jt. Ex. 23 at 43).  Delta registered to do business in Mississippi and applied for a Mississippi gaming license.  Caldwell and Haynes (the "Casino Investors") submitted "suitability" applications to the Commission as Delta's owners, directors, and officers.

**Great Southern**

Taylor formed Great Southern under the laws of Alabama to purchase the Horizon Hotel from Delta.  (Stip. #1, #2, #11).  The Articles of Incorporation of Great Southern Investment Group, Inc. (the "Articles of Incorporation") (Jt. Ex. 16), however, provide that Great Southern was formed for the purpose of "purchasing and operating an existing legal casino and other real property in the state of Mississippi and real estate in Alabama."  Taylor initially was identified as

the sole shareholder of Great Southern.  On February 1, 2011, by amendment to the Articles of Incorporation, Wilburn and Jane Sears, along with Taylor (the "Hotel Investors"), became corporate directors and shareholders of Great Southern.  (Stip. #3, #5; Jt. Ex. 7).

The documents filed with the Office of the Mississippi Secretary of State (the "Secretary of State") on February 18, 2011, to register Great Southern to do business in Mississippi, identified Taylor as the president of Great Southern, Wilburn as the vice-president and secretary, and no one as the treasurer.  (Defs. Ex. 1).  Although Wilburn held the office of secretary of Great Southern, he never performed any of the duties of a secretary as set forth in the Articles of Incorporation. (Trial at 1:38:01-1:39:10) (Nov. 28, 2018).

Great Southern's Mississippi Tax Return for the 2011 tax year (the "Tax Return") (Defs. Ex. 15) is inconsistent with the documents filed with the Mississippi Secretary of State's Office. The Tax Return identifies Grant Taylor, who is Taylor's son, as an additional shareholder of Great Southern.  When confronted with this inconsistency at Trial, Taylor denied that Grant Taylor owned any interest in Great Southern but admitted that Grant Taylor funded his portion of the investment in the Casino Project.  (Trial at 11:46:50-11:48:40) (Nov. 28, 2018).

The Defendants shared office space in a building in Alabama and met daily.  (Trial at 10:00:20-10:00:36) (Nov. 28, 2018).  Wilburn, the secretary of Great Southern, took no notes of these meetings.  Taylor informally kept notes in a yellow legal pad of their weekly, and sometimes daily, discussions but testified that he "lost" the notes when he moved offices.  (*Id.*).

Taylor opened a corporate account in Great Southern's name, using Great Southern's tax identification number, at the Branch Banking & Trust Bank (the "BB&T Account") (Jt. Ex. 12) in Alabama.  Taylor is listed as the only authorized signatory on the BB&T Account.

**Asset Purchase Agreement**

On December 1, 2010, Delta entered into the Asset Purchase Agreement (Jt. Ex. 20) with Columbia for the purchase of the Horizon Hotel and Casino, and Sullivan continued working towards securing a loan from Bally to finance the transaction. Delta informed the Commission of its plan to sell the hotel to Great Southern immediately upon acquiring the Horizon Hotel and Casino and that the Hotel Investors did not intend to file applications for findings of suitability. (Tr. Ex. 7). Delta later provided the Commission, at its request, the Sources and Uses of Funds for Acquisition and Renovation of Horizon Casino (the "Sources and Uses of Funds") (Tr. Ex. 8), showing that the source of the funds to purchase the Horizon Hotel and Casino were investments by Caldwell and Haynes, not a loan from Bally and not investments by Great Southern or the Defendants. (*Id.*). The Commission approved the sale but required Great Southern not to have any role in the management of the Horizon Casino.

Delta had agreed to purchase the Horizon Hotel and Casino from Columbia for $3,250,000.00, but Sullivan was unable to arrange the financing with Bally in time for the closing. To allow the purchase of the Horizon Hotel and Casino to proceed as scheduled, Taylor, Wilburn, and Jane Sears each contributed more than $820,000.00 to Great Southern (Stip. #14) with the understanding that Great Southern would transfer these funds to Caldwell[10] for the purchase of the Horizon Hotel and Casino. (Stip. #15). They knew that their investment in the Horizon Casino contradicted the Sources and Uses of Funds provided to the Commission. (Stip. #15; Jt. Ex. 25 at 15).

---

[10] Taylor testified at Trial that he could not remember whether he transferred the funds from Great Southern to Caldwell or directly to counsel for Delta. Regardless, he agreed that the funds were used by Delta to purchase the Horizon Hotel and Casino. (Trial at 10:14:02-10:14:53) (Nov. 28, 2018).

The infusion of $820,000.00 each into the Casino Project exceeded the amount of the total investment Taylor, Wilburn, and Jane Sears desired to make.  The Project Investors agreed and understood that Delta would return part of the money contributed by Taylor, Wilburn, and Jane Sears when Bally funded the loan.  (Jt. Ex. 25 at 58-60).  Their intent was to "balance" the investment made by the Hotel Investors into the Casino Project by returning to them any amount they contributed more than their respective twenty percent (20%) interest in the Casino Project.  In other words, they agreed to treat a portion of the $820,00.00 contribution as a loan to Delta.  (Trial at 10:55:20-10:55:40).

**Delta's Purchase of Horizon Hotel & Casino & Spin-Off of Horizon Hotel**

On March 25, 2011, Delta purchased the Horizon Hotel and Casino from Columbia for $3,250,000.00 and renamed it the Grand Station Hotel and Casino.   (Jt. Ex. 20 at 14). Simultaneously, Delta sold all assets acquired from Columbia not directly related to casino operations, including the Grand Station Hotel, to Great Southern for a purchase price of $2.1 million pursuant to the Horizon Casino Hotel and Restaurant Assets Spin-Off Agreement (Stip. #16; Jt. Ex. 9; Jt. Ex. 10; Defs. Ex. 4).[11]  Delta retained ownership of the Grand Station Casino. Also, on that same day, Delta and Great Southern entered into the Investment and Conditional Option Agreement (the "Investment Agreement") (Defs. Ex. 4; Tr. Ex. 19) with the City of Vicksburg.  The Investment Agreement required Delta and Great Southern to invest $5 million within the next 18 months for the "renovation, repair, replacement and/or acquisition of improvements, furniture, fixtures, equipment and/or other tangible property located on, or which

---

[11]  The Trustee initiated a separate adversary proceeding (Adv. Proc. 13-00033-NPO) against Great Southern to set aside the transfer of the Grand Station Hotel as a fraudulent conveyance on the ground there was no record of any exchange of funds by Great Southern to Delta for the purchase of the Grand Station Hotel.  The parties settled the action, and the adversary proceeding was closed on June 26, 2015.

shall be located on, any portion of the Casino & Hotel Property; provided, however, that such amount shall not include any portion of the Purchase Price." (*Id.*).

The hotel and casino acquired from Columbia needed substantial work. Shortly after its acquisition, the Project Investors closed the Grand Station Hotel and Casino for renovations. (Trial at 11:28:13-11:31:20) (Nov. 28, 2018).

On May 6, 2011, Delta executed a deed of trust in favor of Bally that encumbered the Grand Station Casino. On May 13, 2011, Bally wired loan proceeds of $3 million to Delta. (Stip. #17). Bally apparently understood that the purpose of the loan was to renovate the Grand Station Casino and to finance Delta's purchase from Bally of commercial gaming equipment.[12] (Tr. Ex. 6).

**$1,357,635.00**

In an email dated May 25, 2011, Sullivan discussed "the breakout for the return of capital funding" with "[e]ach partner's share" being $452,545.00, based upon the twenty percent (20%) interest of each original investor. (Jt. Ex. 17; Jt. Ex. 21 at 46-48; Jt. Ex. 23 at 108-09). On May 27, 2011, Delta wired $1,357,635.00 to the BB&T Account.[13] (Stip. #18; Jt. Ex. 11; Tr. Ex. 4). Delta made an accounting entry on its books that identified the $1,357,635.00 wire transfer as a

---

[12] Bally sued Caldwell individually for fraud and false representation in the United States District Court for the Southern District of Mississippi (the "District Court") in *Bally Gaming, Inc. v. Caldwell*, Civil Action No. 5:13-cv-01084-DCB-MTP. Bally alleged that Delta did not use the $3 million for the purposes set forth in the loan documents and, as a result, the Grand Station Casino was undercapitalized and became insolvent. Of the $3 million, Bally alleged that $500,000.00 was delivered to Caldwell and approximately $1.3 million to Great Southern. Bally claimed that it would not have loaned Delta $3 million if it had not been tricked by Caldwell. Caldwell maintained that the loan was not conditioned on the use of the funds. The parties settled all claims, and the action was dismissed on March 27, 2015.

[13] Delta also transferred $152,000.00 to Caldwell and $180,818.00 to Tangent Gaming, a business owned by Haynes. (Trial at 3:15:17-3:51:36) (Nov. 28, 2018).

loan to Great Southern.  (Stip. #19).  Before the deposit, the beginning balance in the BB&T Account, as of March 31, 2011, was only $147.57.  (Defs. Ex. 6).

On May 31, 2011, Taylor's secretary, acting at Taylor's direction, wrote checks totaling $1,356,000.00 on the BB&T Account, disbursing $452,000.00 each to Taylor, Wilburn, and DJJ&J, an Alabama corporation owned by Jane Sears, along with her two children, John Sears and Jamie Sears.[14]  (Stip. #4, #20; Jt. Ex. 15).  As Taylor explained, the payments were made to restore the Hotel Investors to the percentages they originally agreed to invest in the Casino Project.  (Jt. Ex. 25 at 54-55).  After these checks cleared, the balance of the BB&T Account, as of June 30, 2011, was $1,716.57.  (Defs. Ex. 6).

Article VII of the By-Laws of Great Southern Investment Group, Inc. (Tr. Ex. 10) governs the payment of dividends and provides, in pertinent part, "[d]ividends shall be declared and *paid out of the profits* of the Corporation as often and at such times as the Board of Directors may determine."  (*Id.*) (emphasis added).  At the time of the transfers to the Defendants, the Grand Station Hotel was closed for renovations, Great Southern had no source of income and no profits, Great Southern and Delta were jointly obligated to the City of Vicksburg by the Investment Agreement for $5 million, and the Hotel Investors were aware of an impending flood of the Mississippi River.  (Trial at 11:52:30-11:52:59) (Nov. 28, 2018).  The disbursement of these amounts from the BB&T Account occurred without the declaration of a corporate dividend or any other formal corporate act on the part of Great Southern.

---

[14] DJJ&J is a combination of the first-name initials of Doug Sears, Jane Sears, John Sears, and Jamie Sears.  (Trial at 2:16:32-2:16:49) (Nov. 28, 2018).  Unlike Taylor, Wilburn, and Jane Sears, DJJ&J is not a stockholder of Great Southern.

**Flood & Blackjack Loss**

The Grand Station Hotel and Casino was beset by problems from the start. An historic flood of the Mississippi River, cresting on May 19, 2011, closed almost all waterfront businesses in Vicksburg for several days. Entry into the Grand Station Casino after the flood required patrons to navigate the steep angle of the gangplank. (Trial at 11:06:20-11:06:31) (Nov. 28, 2018; Jt. Ex. 23 at 137). Then, during the opening weekend, a blackjack player won $300,000.00, leaving the Grand Station Casino undercapitalized. (Trial at 3:44:59-3:45:06) (Nov. 28, 2018). In June of 2011, Taylor wired $300,000.00 of his personal funds to Caldwell, who routed the funds to Delta to keep the Grand Station Casino afloat. (Jt. Ex. 25 at 88).

On July 28, 2011, Taylor and other shareholders of Great Southern participated in a telephonic meeting of the Project Investors to find additional funds to operate the Grand Station Casino through a loan to be obtained by Great Southern, using the Grand Station Hotel as collateral. (*Id.* at 137). The Grand Station Casino's revenues per month reportedly were $600,000.00 less than its expenses. (*Id.* at 138-39). Wilburn agreed to loan Great Southern $600,000.00 in return for a promissory note. On August 3, 2011, Great Southern executed a deed of trust in favor of Wilburn encumbering the Grand Station Hotel, and on August 4, 2011, Great Southern wired $300,000.00 from the BB&T Account to Gateway Gaming, an entity owned by Caldwell. (Defs. Ex. 7). Despite this infusion of funds, the financial outlook of the Grand Station Casino did not improve. At some point, the Grand Station Casino notified one or more of the Hotel Investors that it could no longer afford to buy rooms and food from the Grand Station Hotel. (Trial at 3:55:30-3:56:09) (Nov. 28, 2018).

Months later, the Commission demanded that Taylor dissociate himself from both the Grand Station Casino and the Grand Station Hotel and that he vacate the State of Mississippi. (Tr.

Ex. 9; Jt. Ex. 25 at 84-86). In an email to Delta, through its counsel, dated September 19, 2011, Jay K. McDaniel ("McDaniel"), then the deputy director of the Commission, expressed his concern about the "significant amount of control being exhibited by Great Southern (specifically Rick Taylor) over the operations at the casino." (*Id.*). McDaniel warned Delta that "[i]f operations continue in this manner, then a suitability determination will need to be made as to Great Southern and its principals." McDaniel noted that these issues "really point[] to a bigger issue of lack of internal control and lack of segregation of the gaming operations between the licensee and the unlicensed entity Great Southern." (*Id.*). Taylor admitted that Caldwell "got called in on the carpet by the Gaming Commission" and that Haynes told him that the Commission would revoke Delta's license if Taylor showed up again at either the Grand Station Casino or the Grand Station Hotel. (Jt. Ex. 25 at 84). In the same email, McDaniel questioned the $1,357,635.00 transfer of funds to Great Southern, given "there is no documentation as to what this transfer was for, no agreement between the licensee and Great Southern, and no promissory note for Great Southern to pay this back to the licensee." (Tr. Ex. 9).

Taylor's involvement in the operation of the Grand Station Casino is clear. (Jt. Ex. 23 at 136-37). His dream was to own a casino, not a hotel. "Some people grow up with different, different dreams, you know. . . I've always wanted to be connected to a casino." (Trial at 3:53:37-3:53:44) (Nov. 28, 2018). He attended meetings of the Project Investors, including one meeting in Atlanta, where he voiced his opinion regarding the operation and management of the Grand Station Casino. (Jt. Ex. 21 at 51, 60-61). Emails dated August of 2011 reflect that Taylor continued to give directions and make suggestions pertinent to the operation of the Grand Station Casino. (*Id.* at 87). Taylor explained that the Project Investors leaned on him "to know how to run the casino." (Jt. Ex. 25 at 83-84).

**Abandonment of Grand Station Hotel**

The problems encountered early in their investment, the Grand Station Casino's inability to pay for rooms and food, and the Commission's insistence that Great Southern and the Hotel Investors vacate the State of Mississippi led the Hotel Investors and Great Southern to abandon the Grand Station Hotel to Delta, including its day-to-day operations.  (Jt. Ex. 23 at 124-25; Jt. Ex. 25 at 145-46).  Moreover, the Hotel Investors informally agreed to allow Delta, through Caldwell and Mosley, to market the Grand Station Hotel on behalf of Great Southern with the objective of selling both the Grand Station Hotel and Casino to a single buyer. No money exchanged hands, and no written agreement was signed.

**Note**

In the fall of 2011, Delta actively sought a buyer for the Grand Station Hotel and Casino and began negotiations with M Street Investments ("M Street"), a Mississippi corporation.  (Stip. #21; Jt. Ex. 24 at 11).  M Street discovered the $1,357,635.00 loan to Great Southern during the negotiations.  (Stip. #22; Jt. Ex. 25 at 80-81).  Donald Arthur Bailey, president of M Street, believed from his conversations with employees of Great Southern and Delta, that the loan proceeds had been used to improve the property—to pay for renovations to the top three floors and the lobby, and to cover operating losses.  (Jt. Ex. 22 at 24, 27).  In other words, he was unaware that the Defendants had paid themselves $1,356,000.00.  In an email dated December 19, 2011, from Caldwell to Mosley, with the subject line "Account for the missing note," Caldwell forwarded the comment made by his financial adviser that the broker or owner of M Street (nicknamed Richie Rich and in the email referred to as "RR") refused to allow the "$1.357 mm note . . . [to] just evaporate into air."  (Jt. Ex. 18; Jt. Ex. 23 at 116).  "They can see that the money went to Great Southern and know that it was then wired out to an AL account.  They are pretty

certain that they will be required to issue a 1099 if there is not a note that exists which might otherwise indicate that the proceeds were for a loan." (Jt. Ex. 18).

In October or November of 2011, Mosley, on behalf of Delta, contacted Taylor and requested that he sign, on Great Southern's behalf, a promissory note in the amount of $1,357,635.00 (the "Note") (Jt. Ex. 1) consistent with Delta's recordation of a loan in that amount. (*Id.*). Mosley told Taylor that the Note would be only a "paper entry," and that Caldwell eventually would cancel the Note. (Jt. Ex. 25 at 71-72). Taylor initially refused to sign the Note but relented after Mosley threatened to shut down other gaming businesses that they jointly operated in Alabama. (*Id.* at 75-76).

The Note, back-dated May 27, 2011, was created in October or November of 2011 and was signed by Taylor in November 2011. (Stip. #24, #25). The Project Investors agreed, before Taylor executed the Note, that the Note would be cancelled with no collection of the debt it evidenced. (Stip. #26).

**Cancellation of Note**

M Street refused to proceed with any purchase if there were any debts between Great Southern and Delta and insisted that Delta cancel the Note before the closing on the property took place. (Stip. #23; Jt. Ex. 26 at 39-40). Caldwell marked the Note "cancelled" (Stip. #28) on December 30, 2011. (Jt. Ex. 23 at 114).

**M Street's Purchase of Great Southern**

On December 30, 2011, M Street and the Hotel Investors entered into the Hotel Stock Purchase Agreement (the "Hotel Stock Purchase Agreement") (Jt. Ex. 3), as a result of which M Street acquired all stock of Great Southern for the price of $1.00 and the assumption of all liabilities to trade vendors. (Stip. #27; Jt. Ex. 22 at 10-12, 19). M Street did not purchase the stock of Delta

or the Grand Station Casino, to the surprise of the former shareholders of Great Southern. (Jt. Ex. 25 at 37). In connection with the sale to M Street, the Hotel Investors resigned from the board of directors and as officers of Great Southern. (Tr. Ex. 11).

**Bankruptcy**

In March 2012, the Grand Station Casino ceased business operations. On April 2, 2012, Delta commenced a chapter 11 Bankruptcy Case (Bankr. Dkt. 1). On November 30, 2012, the Bankruptcy Case was converted to a chapter 7 case (Bankr. Dkt. 280), and the Trustee was duly appointed.

**Fraudulent Transfer Adversary**

Unaware that Great Southern had disbursed almost all of the $1,357,635.00 to the Defendants, the Trustee on April 2, 2014, initiated adversary proceeding 14-00021-NPO against Great Southern (the "Fraudulent Transfer Adversary"), seeking to recover the payment for the benefit of Delta's bankruptcy estate based on theories of actual and constructive fraud under 11 U.S.C. § 548(a)(1)(A) and (B). Through the discovery process, the Trustee learned of the $1,356,000.00 transfer by Great Southern to the Defendants. The parties resolved the Fraudulent Transfer Adversary by way of a Settlement Agreement dated February 28, 2017 (Jt. Ex. 5), that provided for the entry of an agreed final judgment against Great Southern for $1,357,635.00, conditioned on a release of Great Southern and its present and future directors, officers, and current shareholders. (*Id.*). As part of the settlement, Great Southern assigned to the Trustee any claim it held against the Defendants arising from the $1,357,635.00 transfer from Delta to Great Southern and the subsequent distribution of $1,356,000.00 to the Defendants as well as any claim it had against the Defendants for enforcement of the agreed final judgment. (Jt. Ex. 6). The Court

entered the Order Approving Motion for Compromise and Settlement (the "Order Approving Settlement") (Tr. Ex. 2) on June 14, 2016.

**Appeal & Abandonment of Appeal**

On June 20, 2016, the Defendants appealed the Order Approving Settlement to the District Court in Civil Action No. 3:16-cv-00473-DPJ-FKB. The Trustee filed a motion to dismiss the appeal. The Defendants did not respond, and on January 27, 2017, the District Court dismissed the appeal with prejudice. On February 28, 2017, this Court entered the Agreed Final Judgment (the "Agreed Judgment") (Tr. Ex. 1) approving the settlement.

**Initiation of Warren County Action**

On June 21, 2016, the Defendants filed a Complaint for Declaratory Judgment (the "Warren County Complaint") (Tr. Ex. 18) in Cause No. 16,0055-CI in the Circuit Court of Warren County, Mississippi (the "Warren County Court") against the Trustee, Great Southern, and M Street seeking a declaratory judgment that all claims assigned by Great Southern to the Trustee were time-barred or otherwise void (the "Warren County Action"). Before initiating the Warren County Action, the Defendants did not obtain a modification or termination of the automatic stay in the Bankruptcy Case and did not request leave from the Court to sue the Trustee as required by the *Barton* doctrine. *See Villegas v. Schmidt*, 788 F.3d 156 (5th Cir. 2015).

In a letter dated September 8, 2016, counsel for the Defendants demanded that the Trustee consent to the entry of an order granting the relief the Defendants sought in the Warren County Action. (Tr. Ex. 13). "We are not in bankruptcy court where the Trustee, quite properly, has the benefit of law and rules predominantly in his favor, but are in a court of law where the playing field is level." (*Id.*). The Trustee filed a motion to dismiss the Warren County Action for reasons not disclosed at Trial. On November 2, 2016, the Warren County Court entered the Order (the

"Warren County Order") (Defs. Ex. 20) staying all further proceedings until resolution of the then pending appeal before the District Court. (*Id.*). The Warren County Order provided that after final resolution of the appeal, the Trustee could refile his motion to dismiss "or Plaintiff[s] can request the Court to remove said stay and be allowed to proceed with the case at that time." (*Id.*).

The Trustee testified that he hired Andy Taggart and Porter of the law firm Taggart, Rimes & Graham, PLLC (the "Taggart Firm") to represent him in the Warren County Action as well as in other matters. (Bankr. Dkt. 432). The Trustee introduced into evidence two billing statements dated August 1, 2016 (Tr. Ex. 14) and December 5, 2016 (Tr. Ex. 16), covering fees and expenses charged by the Taggart Firm from May 2, 2016 through December 5, 2016. The Trustee also introduced into evidence orders entered in the Bankruptcy Case approving Delta's payments of these bills as reasonable and necessary expenses of the bankruptcy estate. (Tr. Ex. 15; Tr. Ex. 17).

The first billing statement dated August 1, 2016, covers the period from May 2, 2016 through July 25, 2016, and reflects a total of $8,488.75 in attorneys' fees and no expenses. (Tr. Ex. 14). Porter testified at Trial that these fees, except for $783.75 billed for services performed on July 22, 2016, were incurred defending the Warren County Action, for a total of $7,705.00 in attorneys' fees.[15] The second billing statement dated December 5, 2016, covers the period from August 1, 2016 through December 5, 2016, and reflects a total of $10,003.25 in attorneys' fees and $284.52 in expenses. Porter testified at Trial that these fees, except for $288.75 billed for services performed on September 1, 2016, and $325.00 billed for services performed on September 14, 2016, were incurred defending the Warren County Action, for a total of $9,389.50 in attorneys' fees.[16] Porter further testified that all expenses except for $231.60 billed for copying costs incurred

---

[15] $7,705.00 = $8,488.75-$783.75.

[16] $9,389.50 = $10,003.25-$288.75-$325.00.

on December 5, 2016, were related to the Warren County Action, for a total of $52.92 in expenses.[17]  For the entire period, the total charged the Trustee for defending the Warren County Action was $17,094.50 for attorneys' fees[18] and $52.92 for expenses.

**Initiation of Adversary**

The Trustee initiated the Adversary by filing the Complaint against the Defendants on November 5, 2017.  In the Complaint, the Trustee alleges four causes of action.  (Adv. Dkt. 1 at 1-2).  In Count I:  Piercing the Veil ("Count I") (Adv. Dkt. 1 at 6), the Trustee asserts a claim to pierce the corporate veil of Great Southern and hold the Hotel Investors and/or DJJ&J liable for the Agreed Judgment.  In Count II:  Breach of Duty—Officers and Directors ("Count II") (Adv. Dkt. 1 at 6-7), the Trustee asserts a direct claim against the Hotel Investors for breach of their duties as officers and directors of Great Southern, brought pursuant to Great Southern's post-petition assignment of such claims.  In Count III:  Fraudulent Transfer ("Count III") (Adv. Dkt. 1 at 7-8), the Trustee asserts a fraudulent transfer claim against the Hotel Investors pursuant to the Alabama Uniform Fraudulent Transfer Act, ALA. CODE §§ 8-9A-1, *et seq.*  In Count IV:  Violation of the Automatic Stay ("Count IV") (Adv. Dkt. 1 at 8), the Trustee asserts a claim against the Defendants for violating the automatic stay as set forth in 11 U.S.C. § 362(a)(3).  The Defendants filed the Answer denying that the Trustee is entitled to any relief.

In the PTO, the Trustee stated that he is no longer pursuing a claim under the Alabama Fraudulent Transfer Act.  (PTO at 3 n.1).  During the Trial, a Joint Stipulation of Dismissal with Prejudice of Count III (Fraudulent Transfer) of Plaintiff's Complaint (the "Joint Stipulation") (Adv. Dkt. 54) was entered on November 29, 2018.

---

[17] $52.92 = $284.52-$231.60.

[18] $17,094.50 = $7,705.00 + $9,389.50.

## Discussion

The Trustee seeks damages against the Defendants for violating the automatic stay by filing the Warren County Action and asking the Warren County Court to declare the claims of Delta's bankruptcy estate either invalid or time barred. He also seeks to pierce the corporate veil of Great Southern and collect the Agreed Judgment from each of the Hotel Investors individually. Finally, he seeks to recover damages from the Hotel Investors arising out of their breach of duty as officers and directors, a claim assigned to the bankruptcy estate by Great Southern.

## A.   Subject Matter Jurisdiction, Statutory Jurisdiction & Constitutional Authority

In their Answer and in the PTO, the Defendants contend that Counts I and II are non-core proceedings and that Count IV is a core proceeding. (Adv. Dkt. 36 at 16; PTO at 20). They argue that "to the extent that Counts I [and] II . . . are found to be core proceedings, under the holdings in *Stern v. Marshall*, 564 U.S. 462 (2011) and [*Frazin v. Haynes & Boone, L.L.P.*] *(In re Frazin)*, 732 F.3d 313 (5th Cir. 2013), this court lacks jurisdiction to consider these matters or to enter final judgments." (Adv. Dkt. 36 at 16). They specifically do not consent to entry of final orders or judgment by this Court. (*Id.*).

The Defendants appear to conflate the Court's subject matter jurisdiction with its constitutional authority as an Article I tribunal. *Stern* does not limit a bankruptcy court's subject matter jurisdiction, only its constitutional authority to hear matters otherwise within its jurisdiction—the so-called "*Stern* claims." A bankruptcy court's subject matter jurisdiction is set forth in 28 U.S.C. § 1334; its statutory authority is set forth in 28 U.S.C. § 157; its constitutional powers are dictated by the scope of authority allocated the tribunals created under Articles I and III of the U.S. Constitution.

A bankruptcy court's subject matter jurisdiction is limited to proceedings "arising under" the Bankruptcy Code, "arising in" a bankruptcy case, or "related" to a bankruptcy case. 28 U.S.C. § 1334(b). "Arising under" and "arising in" proceedings are core. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987). Core proceedings either arise only in bankruptcy or they involve a right created by bankruptcy law. *Id.* A nonexclusive list of core proceedings is set forth in 28 U.S.C. § 157(b)(2)(A)-(P) and includes "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate."

"Related" proceedings are non-core. 28 U.S.C. § 157(b)(3). Non-core proceedings do not invoke a substantive bankruptcy right and can exist outside of bankruptcy. *Wood*, 825 F.3d at 97. For related-to jurisdiction, the Fifth Circuit Court of Appeals has adopted the test articulated by the Third Circuit Court of Appeals in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), that a proceeding is related to a bankruptcy case when "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood*, 825 F.3d at 93. The bankruptcy court has related-to jurisdiction if "the outcome of the proceeding . . . could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir. 2007). By statute, bankruptcy judges may hear and enter dispositive orders and judgments in all core proceedings. 28 U.S.C. § 157(b)(1). In contrast, bankruptcy judges may hear non-core proceedings but must submit proposed findings of fact and conclusions of law to the District Court unless all parties consent to the entry of judgment by the bankruptcy court. 28 U.S.C. § 157(c)(1). Bankruptcy courts do not have subject matter jurisdiction under 28 U.S.C. § 1334 to hear proceedings that are

neither core nor non-core.  The Adversary contains several claims, which the Court must analyze separately.  *Davis v. Life Inv'rs Ins. Co. of Am.*, 282 B.R. 186, 193 n.4 (S.D. Miss. 2002).

### 1.    Stay-Violation Claim

The Court finds that Count IV, the Trustee's claim for violation of the automatic stay, is a quintessential "core" proceeding—a claim that could not have arisen outside the context of a bankruptcy case.  This Court has subject matter jurisdiction to hear that claim under 28 U.S.C. § 1334 and statutory authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(A).  *See Burns v. Home Zone Sales & Lease Purchase, LLC (In re Burns)*, 503 B.R. 666, 670 (Bankr. S.D. Miss. 2013) (holding violation of automatic stay to be a core claim).  The Defendants do not question the constitutional authority of the Court to hear and to determine the Trustee's stay-violation claim.

### 2.    Veil-Piercing and Breach-of-Duty Claims

Count I and Count II easily satisfy the *Pacor* test for proceedings "related to" a bankruptcy case.  The Trustee's veil-piercing and breach-of-duty claims certainly have a possible effect on Delta's rights and liabilities.  As to the Court's statutory jurisdiction, 28 U.S.C. § 157(b)(2)(B) does not specifically identify a claim for either veil-piercing or breach of-duty as a core proceeding. These claims existed prior to the commencement of the Bankruptcy Case and would likewise continue to exist independently from the Bankruptcy Code.  The Court finds that these claims are solely creatures of state law and are non-core proceedings.  As such, the Court has the statutory authority to proceed only under 28 U.S.C. § 157(c)(1) and submit as to those two state-law claims proposed findings and conclusions of law to the District Court for the entry of a final judgment. To the extent that they are *Stern* claims, that is, to the extent that they are core proceedings that fall outside the Court's constitutional authority, this Court nevertheless has the authority to hear

them under the procedures set forth in 28 U.S.C. § 157(c). *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). Whether they are non-core proceedings or *Stern* claims, as suggested by the Defendants, the procedure under 28 U.S.C. § 157(c)(1) is the same.

**B.      Stay-Violation Claim and *Barton* Doctrine**

The Defendants instituted litigation against the Trustee in the Warren County Court, seeking a declaratory judgment that any claims to collect the Agreed Judgment from them individually are void or barred by the statute of limitations and *res judicata*. It is undisputed that the Defendants failed to seek relief from the Court to terminate or modify the automatic stay before filing the Warren County Complaint and failed to seek leave from this Court before naming the Trustee as a defendant.

**1.      Stay-Violation Claim**

When a debtor files a bankruptcy petition, 11 U.S.C. § 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The automatic stay is broad in scope and applies to almost every action against the debtor or property of the debtor, except as set forth in 11 U.S.C. § 362(b). Once the stay is in effect, a creditor cannot undertake any judicial action, including any declaratory judgment action, within the scope of the stay without obtaining relief from the bankruptcy court.

Section 362(k)(1) provides that "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). The Fifth Circuit has established a three-part test for establishing an actionable violation of the stay under 11 U.S.C. § 362(k): (1) the creditor must have known of the existence of the stay; (2) the creditor's acts must have been intentional; and (3) the creditor's acts must have violated the stay. *Young v. Repine (In*

*re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008).  Specific intent to violate the automatic stay is not required to prove the willfulness of a creditor's violation.  *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008).  "Whether the [defendant] believes in good faith that it had a right to [act contrary to the statute] is not relevant to whether the act was 'willful' or whether compensation must be awarded."  *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005) (citation & quotations omitted).

The Court finds that the filing of the Warren County Complaint, as well as the continued prosecution of the Warren County Action, constituted a willful violation of the stay that entitles the Trustee to damages and other relief under 11 U.S.C. § 105(a).  The Defendants were aware of the Bankruptcy Case when they filed the Warren County Complaint, as shown by the allegations in the Warren County Complaint that reference the Bankruptcy Case.  (Tr. Ex. 18 at 2-4).  The Defendants acted intentionally in pursuing litigation against the Trustee in the Warren County Court, a forum perceived by them as friendlier to their position than this Court.  (Tr. Ex. 13).  The Warren County Action interfered with the Trustee's marshaling of the assets of Delta's bankruptcy estate in violation of 11 U.S.C. § 362(a)(3).  Other courts have found an actionable stay violation under similar circumstances.

In *AP Industries, Inc. v. SN Phelps & Co. (In re AP Industries, Inc.)*, 117 B.R. 789, 791 (Bankr. S.D.N.Y. 1990), for example, a creditor filed a class action suit in state court against the debtor's directors, alleging that certain prepetition transfers of the debtor's property were fraudulent conveyances.  The bankruptcy court concluded that the state court litigation violated the automatic stay under 11 U.S.C. § 362, which stays the commencement of judicial actions and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  In reaching this conclusion, the bankruptcy court rejected the

creditor's argument that the automatic stay did not apply because its state court suit sought monetary damages from non-debtor third parties and not the return of the alleged fraudulently conveyed asset, finding instead that "[t]his is precisely the type of activity and burden to the estate which [11 U.S.C.] § 362 of the Code was intended to alleviate." *Id.* at 799, 801. The state court actions "are a transparent attempt by the [d]efendants to 'end run' the automatic stay . . . [and] . . . constitute acts to exercise control over property of the estate in violation of [11 U.S.C.] § 362 of the Code." *Id.* at 799. The bankruptcy court held the creditor liable to the debtor for actual damages.

A similar result was reached in *In re Jefferson County, Alabama*, 484 B.R. 427, 432 (Bankr. N.D. Ala. 2012). There, Jefferson County, Alabama (the "County") commenced a chapter 9 bankruptcy case; the County's bankruptcy estate included a hospital that provided inpatient and emergency room medical care for the County's indigent residents. The hospital was operating at substantial losses, and the County decided to close its emergency room and inpatient services. The City of Birmingham, Alabama and its mayor (the "City") filed a declaratory judgment action in state court to challenge the decision of the County, to close the hospital. *Id.* The County filed an emergency motion to enforce the automatic stay. The bankruptcy court ruled that the City's declaratory judgment action was within the purview of 11 U.S.C. § 362(a)(3) because it was an attempt by the City to exercise control over the County's hospital property. *Id.* at 446-47. Accordingly, the bankruptcy court held that the City's action violated the automatic stay. *Id.* at 447.

The Defendants essentially conceded at Trial that the Warren County Action violated the automatic stay imposed by 11 U.S.C. § 362 but argued that the Trustee waived the stay by defending the Warren County Action on a basis other than the violation of the stay. This argument

is misplaced.  As a rule, a debtor may not unilaterally waive the automatic stay.  *See Marcus, Stowell & Beye Gov't Secs., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 230 n.4 (5th Cir. 1986). The stay protects both debtors and creditors, and 11 U.S.C. § 362 grants the bankruptcy court the exclusive authority to grant relief from the stay.  *Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 62 (6th Cir. 1983).  Regardless, the basis for the minority position espoused by the Defendants is the concern of some courts that "[t]o hold otherwise would allow a [debtor] to have [a] trump card that he could play if he did not like the outcome of the action, but allowing him [to] take a favorable judgment."  *In re Cobb*, 88 B.R. 119, 121 (Bankr. W.D. Tex. 1988).  That concern is not implicated here where the Trustee did not defend the Warren County Action on the merits and did not seek affirmative relief.  The extent of the Trustee's participation in the Warren County Action was to prosecute a motion to dismiss, though apparently for reasons unrelated to the stay violation. Before addressing the issue of damages for violation of the stay, the Court considers next the application of the *Barton* doctrine.

## 2.  *Barton* Doctrine

Under the common-law *Barton* doctrine, parties seeking to sue a court-appointed receiver (or a bankruptcy trustee) must first obtain leave of the appointing court before filing the lawsuit. *Barton*, 104 U.S. at 126.  Such permission is necessary because the appointing court has exclusive *in rem* jurisdiction over the property administered by an appointed receiver.  *Id.* at 128.  If permission from the appointing court is not obtained before suit is filed, the other forum lacks subject matter jurisdiction.  *Id.*  The *Barton* doctrine includes actions seeking bankruptcy estate property as well as actions against a bankruptcy trustee for conduct during the pendency of the bankruptcy case.  *See Villegas*, 788 F.3d at 156 (signifying the continued viability of the *Barton* doctrine even when the claims qualify as *Stern* claims under *Stern*, 564 U.S. at 482-85.  *See*

*Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975). The purpose of the *Barton* doctrine is to protect bankruptcy trustees acting in their official capacity. See *Barbee v. Price Waterhouse, LLP (In re Solar Fin. Servs., Inc.)*, 255 B.R. 801, 805 (Bankr. S.D. Fla. 2000). "Without the requirement [of obtaining leave], trusteeship will become a more irksome duty, and so it will be harder for courts to find competent people to appoint as trustees. Trustees will have to pay higher malpractice premiums, and this will make the administration of the bankruptcy laws more expensive." *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998).

Because neither party addressed the application of the *Barton* doctrine in the PTO or at Trial, the Court granted the parties an opportunity to submit post-Trial briefs, which neither opted to do. Here, the Defendants sued the Trustee while the Bankruptcy Case was pending before this Court without obtaining leave of this Court. The Defendants' actions clearly violated the *Barton* doctrine.

### 3.   Injunctive Relief, Actual Damages & Punitive Damages

#### a.   Injunctive Relief

Pursuant to 11 U.S.C. § 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court finds that an injunction should be entered under 11 U.S.C. § 105 requiring the Defendants to file pleadings necessary to dismiss the Trustee from the Warren County Action. This mandatory injunction is necessary to close the door left opened in the Warren County Order that stayed the Warren County Action but allowed the Defendants to ask the Warren County Court to remove the stay once the appeal to the District Court was resolved.

b.    **Actual Damages**

The Court finds that the Trustee is entitled to recover from the Defendants the attorneys'

fees and expenses the estate incurred in defending the Warren County Action as actual damages

under 11 U.S.C. § 105(a).[19]  Based on Porter's testimony and the billing statements, the Trustee is

entitled to recover from the Defendants, jointly and severally, $17,147.42.[20]  In awarding these

damages, the Court rejects the Defendants' argument that the amount is unreasonable because of

the Trustee's failure to enforce the stay in the Bankruptcy Case or otherwise to take steps to enjoin

the Warren County Action.  This Court previously has considered mitigation as a factor in

determining the reasonableness of damages incurred because of a stay violation.  *See, e.g.*, *In re*

*Adams*, 516 B.R. 361, 374 (Bankr. S.D. Miss. 2014).  Here, however, the Trustee filed a motion

to dismiss the Warren County Action, and, therefore, the Court finds that the Trustee made

reasonable efforts to mitigate the estate's actual damages.

As another component of actual damages, the Court also will award the Trustee reasonable

attorneys' fees and expenses incurred by the estate in prosecuting the 11 U.S.C. § 362(k) claim in

the Adversary.  *Repine*, 536 F.3d at 522.  The Trustee may submit a fee itemization and supporting

affidavit as set forth in the Uniform Local Rules of the U.S. Bankruptcy Courts for the Northern

and Southern Districts of Mississippi (the "Local Rules") within fourteen (14) days of the date of

this Opinion.  *See* MISS. BANKR. L.R. 7054-1(b)(2)(A)-(B).

---

[19] Section 362 provides that "an *individual* injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1) (emphasis added).  Because the violation of the automatic stay is viewed as tantamount to the violation of a court order, a bankruptcy court may address a violation of the stay by exercising its civil contempt powers under 11 U.S.C. § 105(a).  *See In re RX Pro of Miss., Inc.*, Adv. Proc. 16-00288-NPO (Bankr. S.D. Miss. Mar. 4, 2016), Dkt. 120 (granting corporate debtor relief under 11 U.S.C. § 105(a) for violation of the automatic stay).

[20] $17,147.42 = $17,094.50 (attorneys' fees) + $52.92 (expenses).

### c.        Punitive Damages

Punitive damages may be awarded for a willful violation of the automatic stay under 11 U.S.C. § 362(k) in "appropriate circumstances."   The Fifth Circuit has held that an "egregious conduct" standard applies in considering an award of punitive damages.  *Repine*, 536 F.3d at 521.

The Court finds that the actions of the Defendants rose to the level of egregious conduct that warrants an award of punitive damages under 11 U.S.C. § 105.  The Defendants pursued the Warren County Action as a strategy to disrupt the administration of the Bankruptcy Case and to find a more favorable forum.  This strategy is like the one they devised to circumvent the Commission's suitability requirements.  "[Punitive] damages are generally designed to cause a change in the creditor's behavior, and serve as a deterrent to certain actions of creditors."  *Collier v. Hill (In re Collier)*, 410 B.R. 464, 478 (Bankr. E.D. Tex. 2009).  The Court finds that $5,000.00 in punitive damages is an appropriate amount to deter the Defendants from such actions in the future.

## C.        Veil-Piercing & Breach-of-Duty Claims

Before addressing the merits of the Trustee's veil-piercing and breach-of-duty claims, the Court briefly considers certain issues raised by the Defendants in the PTO and apparently in the

Warren County Action. These issues include the standing of the Trustee, choice of law, and statute of limitations.[21]

### 1.      Standing of the Trustee

The commencement of a bankruptcy case creates an estate, and the bankruptcy trustee, as the representative of the estate under 11 U.S.C. § 323, is required to marshal the debtor's property for the benefit of the estate. *Schnelling v. Thomas (In re AgriBio Tech, Inc.)*, 319 B.R. 207, 211 (Bankr. D. Nev. 2004) (citing 11 U.S.C. § 541(a), § 704). Property of the bankruptcy estate includes all "legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and "[a]ny interest in property that the estate acquires after the commencement of the case," 11 U.S.C. § 541(a)(7). The bankruptcy estate includes causes of action either that belonged to the debtor at the commencement of the case or were acquired by the debtor after the commencement of a bankruptcy case. Whether a bankruptcy trustee has standing to pursue a cause of action simply depends on whether the cause of action belongs to the debtor's bankruptcy estate. *AgriBio Tech*, 319 B.R. at 212; *see Collins v. Sydow (In re NC12, Inc.)*, 478 B.R. 820, 831 (Bankr. S.D. Tex. 2012).

The Court finds that the Agreed Judgment of $1,357,635.00 is an asset of Delta's bankruptcy estate, and the Trustee has standing to collect the Agreed Judgment against the Hotel

---

[21] The Defendants also raised as an issue in the PTO that the Hotel Stock Purchase Agreement entered into between the Hotel Investors and M Street barred all claims that Great Southern assigned to the Trustee. (PTO at 20). In pertinent part, the Hotel Purchase Agreement provides that "[i]f [M Street] asserts a claim against [the Hotel Investors], the [Hotel Investors] will have the right and the option to participate in . . . [t]he defense or settlement of any claims . . . . brought by a third party." (Jt. Ex. 3 at 5). Additionally, M Street agreed not to settle any claims without the prior written approval of the Hotel Investors. (*Id.*). The Defendants' argument is unclear, but they appear to challenge the Order Approving the Settlement entered in the Fraudulent Transfer Adversary. The Order Approving the Settlement became final after the District Court dismissed the Defendants' appeal, and the Court rejects the Defendants' renewed efforts to revisit it.

Investors by attempting to pierce the corporate veil of Great Southern.  The Court also finds that the Trustee has standing to maintain his breach-of-duty claim against the Hotel Investors based upon the assignment by Great Southern to Delta of any claims Great Southern may have against them, as former directors/officers and shareholders.  *Tulis v. M.E.-R.E. Holding, LLC* (*In re Barnett*), Adv. No. 14-09036, 2015 WL 9581384, at *6-7 (Bankr. S.D.N.Y. Dec. 29, 2015) (holding that a bankruptcy trustee has standing to sue on assigned claims where the recovery of damages would inure to the benefit of the bankruptcy estate, and the damages would be distributed in accordance with the distribution priorities of the Code); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 650-51 (Bankr. N.D. Ill. 1998) (recognizing that an assignment of a claim to a bankruptcy estate effectively turns the assigned claim into property of the bankruptcy estate, which the trustee has the duty to marshal for the benefit of the estate like any other asset).

### 2.      Choice of Law

Bankruptcy courts apply the choice-of-law rules of the state where they sit with respect to state law claims that do not implicate federal policy.  *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981); *Kitchens Bros. Mfg. Co. v. First Tenn. Bank Nat'l Ass'n (In re Kitchens Bros. Mfg. Co.)*, Adv. Proc. 16-00008-NPO, 2016 WL 3699341, at *7 (Bankr. S.D. Miss. July 5, 2016).  The forum state, Mississippi, resolves choice-of-law issues by applying the following steps:  (1) determine whether the laws are procedural or substantive, (2) if substantive, classify the laws as either tort, property, or contract; and (3) look to the relevant section of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS.  *Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 433-34 (Miss. 2006).  If the law is procedural, Mississippi law applies.  *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014).  "[T]he law of the forum

determines whether an issue in the action is substantive or procedural in nature." *Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.*, 524 F.3d 588, 593 (5th Cir. 2008) (citation & quotations omitted).

### a.  Mississippi's Procedural Law

Mississippi courts follow the traditional rule that a statute of limitation is deemed procedural, for purposes of choice of law, and will apply its own statute of limitations to causes of action arising under the laws of another jurisdiction. *Ramsay v. Boeing Co.*, 432 F.2d 592, 596 (5th Cir. 1970). The exception to the rule, which does not apply here, is that Mississippi courts will apply the limitation period set forth in a foreign statute if the cause of action arises under that foreign statute. *Id.* at 597; *see Siroonian v. Textron, Inc.*, 844 F.2d 289, 292 (5th Cir. 1988). The Trustee is not relying on any foreign statute but on the common-law of the state of Alabama for his veil-piercing and breach-of-duty causes of action.

### (1.)  Veil-Piercing Claim—Statute of Limitations

In Mississippi, the statute of limitations for piercing a corporate veil is seven (7) years, MISS. CODE ANN. § 15-1-43, and begins to run when an underlying judgment is obtained against the corporation whose veil the plaintiff seeks to pierce. *Restaurant of Hattiesburg, LLC v. Hotel & Restaurant Supply, Inc.*, 84 So. 3d 32, 44-46 (Miss. Ct. App. 2012). The Trustee obtained the Agreed Judgment on February 28, 2017, and, therefore, his action to pierce the corporate veil of Great Southern, commenced on November 5, 2017, is timely.[22]

---

[22] Alabama law is like Mississippi's as to the inception date for the statute of limitations. Under Alabama law, a cause of action to pierce the corporate veil and impose liability on a shareholder arises when a judgment holding the corporation liable has been rendered. *Anglin v. Estes* (*In re Estes*), 415 B.R. 568, 576 (Bankr. N.D. Ala. 2009). In Alabama, however, the statute of limitations period for filing a veil-piercing claim is twenty (20) years, which is more than the seven (7)-year statute of limitations period under Mississippi law.

**(2.)      Breach of Duty—Statute of Limitations**

Mississippi procedural law also provides the statute of limitations applicable to the Trustee's breach-of-duty claim.  In Mississippi, the general three-year statute of limitations in MISS. CODE ANN. § 15-1-49 applies to claims for breach of fiduciary duty.  *Adams v. Regions Bank*, No. 3:14cv615-DPJ-FKB, 2016 WL 71429, at *5 (S.D. Miss. Jan. 6, 2016).  Because the transfers in question took place on May 31, 2011, and the Trustee filed the Complaint on November 5, 2017, the Trustee's breach-of-duty claim, having accrued before November 5, 2014, is time-barred absent tolling of the statute of limitations.  *See Walker v. Epps*, 550 F.3d 407, 415 (5th Cir. 2008) ("Just as we borrow the forum state's statute of limitations . . . , we borrow also the state's tolling principles.").

The Trustee contends that the statute of limitations was tolled by the doctrine of fraudulent concealment.  He asserts that neither he nor the new shareholders of Great Southern discovered the transfers to the Defendants until November 13, 2014, when he obtained statements from the BB&T Account by subpoena issued in the Fraudulent Transfer Adversary.  This assertion as to when the transfers were discovered was unchallenged by the Hotel Investors at Trial.  The tolling of the statute until November 13, 2014, would render the Trustee's breach-of-duty claim timely.

The doctrine of fraudulent concealment, as set forth in MISS. CODE ANN. § 15-1-67, provides:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

MISS. CODE ANN. § 15-1-67; *see Robinson v. Cobb*, 763 So. 2d 883, 887 (Miss. 2000).  Under Mississippi law, a plaintiff asserting fraudulent concealment as a basis for tolling must prove that: (1) the defendant engaged in some affirmative act of concealment and (2) despite the exercise of

due diligence, the plaintiff was unable to discover the conduct that forms the basis of its claim. *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 463 (5th Cir. 2003); *Sundbeck v. Sundbeck*, No. 1:10CV23-A-D, 2011 WL 5006430, at *2 (N.D. Miss. Oct. 20, 2011).

The facts developed at Trial support the application of the tolling provisions of MISS. CODE ANN. § 15-1-67.  After the transfers in question, the Hotel Investors created the Note to conceal the payment to Great Southern as a loan to renovate the Grand Station Hotel when the hidden purpose was to return to the Hotel Investors a portion of their investment in the Casino Project. The Court finds that this Adversary, initiated on November 5, 2017, was brought within the three-year period after the alleged breach of duty was first discovered on November 13, 2014, and is therefore timely.

### b.   Alabama's Substantive Law

When the choice of substantive law is in question, Mississippi courts apply the "center of gravity" test to each issue and in applying this test, embrace the RESTATEMENT (SECOND) CONFLICT OF LAWS. *Hartford Underwriters Ins. Co.*, 524 F.3d at 593-94 (citing *Zurich*, 920 So. 2d at 433); *Boardman v. United Servs. Auto. Ass'n*, 470 So. 2d 1024, 1031 (Miss. 1985).  The choice-of-law inquiry is less cumbersome when the dispute involves the internal affairs of a corporation.  In that event, the law of the jurisdiction in which the corporation was organized applies to claims brought by and against corporate insiders.  *Regions Bank v. JP Realty Partners, Ltd.*, 912 F. Supp. 2d 604, 614-15 (M.D. Tenn. 2012) ("The local law of the state of incorporation will be applied to determine the existence and the extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts") (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 307 (2012)); *see* 1 FLETCHER CYC. CORP. § 41.90 (2018).

This choice-of-law rule, known as the "internal affairs" doctrine, "recognizes that only one jurisdiction should have authority to regulate a corporation's internal affairs—matters peculiar to the relationships between the corporation and its shareholders, directors, and officers—because otherwise a corporation could be faced with inconsistent rules regarding its internal governance procedures." *Johnson v. Edwards Family P'ship, LP (In re Cmty. Home Fin. Servs., Inc.)*, 583 B.R. 1, 66 (Bankr. S.D. Miss. 2018); *see Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 765 (Bankr. W.D. La. 2013) (holding that when the issue at hand involves the internal affairs of a business entity, the law of the state of formation usually controls the court's choice of law analysis) (citing *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1548 n.3 (5th Cir. 1985)).  In *Williams v. Clark Sand Co.*, 212 So. 3d 804 (Miss. 2015), for example, the Mississippi Supreme Court, citing § 299 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, held that the laws of the state of incorporation apply in disputes regarding a corporation's existence.  *Williams*, 212 So. 3d at 809.  This holding is consistent with the Mississippi Business Corporation Act, which provides that it "[does] not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in [Mississippi]." MISS. CODE ANN. § 79-4-15.05(c).

Great Southern was incorporated under the laws of the state of Alabama by Taylor on July 27, 2010.  (Stip. #1).  Applying the "internal affairs" doctrine, the Court finds that the substantive

law of Alabama applies to the Trustee's claims against the Hotel Investors for piercing the corporate veil and breach of duty.[23]

### 3.    Veil-Piercing Claim

In Alabama, piercing the corporate veil is not an independent cause of action for substantive relief but, rather, furnishes a means of imposing liability on corporate shareholders either by asserting a cause of action that otherwise would exist only against the corporation or collecting a judgment against the corporation. *Ryals v. Lathan Co.*, 77 So. 3d 1175, 1179 (Ala. 2011). The Trustee invokes the remedy of veil piercing to collect the Agreed Judgment from the Hotel Investors and/or DJJ&J.

To assess the Trustee's allegation that the Defendants abused Great Southern's corporate form, an overview of certain precepts of corporate law is necessary. In Alabama, as elsewhere, a corporation is a distinct and separate legal entity from the individuals who are its shareholders or who manage its affairs as its directors or officers. *Aureus Int'l, Inc. v. Coala, Inc. (In re Coala, Inc.)*, 182 B.R. 887, 893 n.3 (Bankr. N.D. Ala. 1995) (citing *Warrior River Terminal Co. v. State*, 58 So. 2d 100, 101 (Ala. 1952)). "The legal title and ownership of corporate property is in the corporation." *Id.* In other words, a shareholder does not own the corporation's property—"[a] share of stock in a corporation merely entitles a shareholder to an aliquot portion of the proceeds of the assets of the corporation, over and above the indebtedness of the corporation." *Coala*, 182 B.R. at 893 n.3 (citing *Hall & Farley v. Ala. Terminal & Improvement Co.*, 56 So. 235, 242 (Ala.

---

[23] The "internal affairs" doctrine would not apply to claims against DJJ&J, a corporate outsider, but the Trustee does not assert a claim against DJJ&J for aiding and abetting the breach of fiduciary duty allegedly committed by the Hotel Investors. It is thus unnecessary to engage in an analysis of Mississippi's standard conflict of law rules. *Compare Cont'l Cas. Co. v. Compass Bank*, No. 04-0766-KD-C, 2006 WL 566900, at *12 (S.D. Ala. Mar. 6, 2006) (holding that Alabama does not recognize a cause of action for aiding and abetting a breach of fiduciary duty), *with Dale v. Ala Acquisitions, Inc.*, 203 F. Supp. 2d 694, 701 (S.D. Miss. 2002) (holding that Mississippi would recognize cause of action for aiding and abetting a breach of fiduciary duty).

1911)).  Moreover, a shareholder is not entitled to share in the assets of the corporation until a dividend is declared or the corporation is liquidated.  *Id.* (citing *First Nat'l Bank of Birmingham v. Perfection Bedding Co.*, 631 F.2d 31, 32 (5th Cir. 1980)).  Normally, the corporate structure insulates shareholders, officers, and directors from individual liability for the debts and obligations of the corporation.

These general rules are not cast in stone.  Alabama will not recognize the separate existence of a corporation when it fails to function as a separate legal entity.  *Cohen v. Williams*, 318 So. 2d 279, 281 (Ala. 1975).  In determining whether to pierce the corporate veil and impose individual liability, Alabama courts consider the following factors:  (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of business; or (3) operation as an instrumentality or alter ego.  *M&M Wholesale Florist, Inc. v. Emmons*, 600 So. 2d 998 (Ala. 1992).  In *Backus v. Watson*, 619 So. 2d 1342, 1345 (Ala. 1993), the Alabama Supreme Court explained that veil-piercing is appropriate in instances of fraud or where recognition of the corporate existence will result in injustice or inequitable consequences.  The *Backus* Court set forth the circumstances in which a corporate veil may be pierced, as follows:

> The corporate veil may be pierced where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where the corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation.

*Backus*, 619 So. 2d at 1345 (citation & quotations omitted).[24]

---

[24] Similar to Alabama law, to pierce the corporate veil under Mississippi law, a plaintiff must show:  (1) some frustration of expectations regarding the party to whom the plaintiff looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.  *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989).

A year later, in *Econ Marketing, Inc. v. Leisure American Resorts, Inc.*, 664 So. 2d 869, 870 (Ala. 1994), the Alabama Supreme Court held that the trial court erred in not piercing the corporate veil of a corporation where the facts showed that all corporate formalities had been disregarded. A shareholder purportedly made a series of personal loans to the corporation, but no promissory notes evidenced any of these transactions, and no records of corporate transactions existed to demonstrate that the corporation authorized the loans. *Id.* at 871. Financial records, books, and minutes of the meeting of the corporate directors all were nonexistent. *Id.* Under these facts, the Alabama Supreme Court pierced the corporate veil and found the shareholder liable for a corporate debt. The Court finds that the evidence developed at Trial supports the piercing of the corporate veil of Great Southern based on the three factors established in *Emmons* and the application of those factors in *Econ Marketing*.

### a.     Inadequacy of Capital

The transfer of $1,356,000.00 to the Defendants from the BB&T Account left Great Southern and the Grand Station Hotel underfunded. Only $1,716.57 remained in the BB&T Account when the Hotel Investors (as well as anyone else following the news) were aware of an impending historic flood of the Mississippi River. Moreover, the Investment Agreement required Great Southern and Delta to invest $5 million in the Grand Station Hotel and Casino within eighteen (18) months. The funds should have remained in the BB&T Account given these prospective liabilities but instead were withdrawn to reimburse the Defendants for a portion of their investment in the Casino Project.

At Trial, the Hotel Investors denied that the Investment Agreement obligated Great Southern to expend any funds since the City of Vicksburg's remedy for Great Southern's default was the exercise of an option to purchase the Grand Station Hotel and Casino for $3,250,000.00.

(Tr. Ex. 19).  In that event, Great Southern would lose its most valuable asset, the Grand Station Hotel, a result the Hotel Investors should have found problematic.

The Hotel Investors further denied that Great Southern was underfunded and maintained that the Grand Station Hotel operated on a cash basis.  Yet Taylor admitted that only three weeks before Trial, he paid a debt of $26,000.00 incurred by Great Southern that he personally had guaranteed. (Trial at 3:46:00-3:50:00) (Nov. 28, 2018).

The Hotel Investors next argued that of the $1,356,000.00 disbursed to the Defendants, they eventually returned $900,000.00.   The testimony at Trial showed that Taylor wired $300,000.00 from his personal account to Caldwell in June of 2011 and Wilburn loaned Great Southern $600,000.00 of which $300,000.00 was sent to Caldwell's company in early August of 2011 to keep the Grand Station Casino afloat.  Thus, two-thirds of these funds were reinvested by Taylor and Wilburn in the Grand Station Casino, not the Grand Station Hotel, and not without encumbering the Grand Station Hotel.  Needless to say, the return of $600,000.00 to Delta did not replace the funds drained from Great Southern.  The argument of the Hotel Investors that they returned $900,000.00 of the $1,356,000.00 in question demonstrates their continued failure to view Great Southern as an entity separate and apart from Delta.

The Court finds that the evidence at Trial demonstrated that Great Southern was set up for financial failure.  The Hotel Investors used Great Southern to hide the source of the funds they invested in Delta without regard to Great Southern's financial welfare.

### b.       Fraudulent Purpose in Conception or Operation of Business

The Hotel Investors formed Great Southern as a separate entity because Taylor and Wilburn were barred by the Mississippi Gaming Act from owning an interest in a casino and Jane Sears was unwilling to provide the financial information necessary to satisfy the Commission's

suitability requirements. The Commission approved the sale of the Grand Station Hotel to Great Southern only so long as Great Southern and the Hotel Investors had no ownership interest in the Grand Station Casino and exerted no control or influence over its gaming operations. In theory, the formation of Great Southern should have solved the legal problems created by Taylor's and Wilburn's misdemeanor gambling convictions and Jane Sears' privacy concerns except that the Hotel Investors never abandoned the original undertaking of the Project Investors. The Hotel Investors clearly had no interest in owning a hotel from the outset. Their interest was in the Grand Station Casino, akin to their interest in bingo and sweepstakes parlors in Alabama. Indeed, the internal corporate documents filed with the Secretary of State to register Great Southern to do business in Mississippi provide that Great Southern was formed to operate a casino in Mississippi. Taylor expressed incredulity that the Mississippi Gaming Act disqualified him from owning a casino in Mississippi when he could own a casino in Las Vegas. Taylor's disdain for the Mississippi Gaming Act explains to some extent why the Hotel Investors were willing to take steps to circumvent the Commission's suitability provisions.

The Court finds that Great Southern was formed as a subterfuge to evade the licensing requirements of the Mississippi Gaming Act. That Great Southern was formed for a fraudulent purpose is demonstrated by the misinformation the Casino Investors provided the Commission regarding the source of the funds used to acquire the Horizon Hotel and Casino. (Jt. Ex. 8). They deliberately hid from the Commission the investments from Great Southern and/or the Hotel Investors as well as the loan from Bally.

Finally, it is telling that the Hotel Investors invested as much, if not more, of their personal funds into the Grand Station Casino than into the Grand Station Hotel. Their investment in the Grand Station Hotel was approximately $2.1 million, the purchase price. Wilburn later invested

an additional $300,000.00 for a total of $2.4 million. In comparison, the Hotel Investors each contributed $954,000.00 toward the purchase of the Grand Station Hotel and Casino for a total of $2,862,000.00.[25]   Later Taylor and Wilburn each invested an additional $300,000.00 into the Grand Station Casino, increasing the investment to $3,462,000.00.

### c.   Disregard of Corporate Formalities

The Court finds that the Hotel Investors did not observe corporate formalities with respect to Great Southern.  Wilburn, identified as the secretary of Great Southern in documents filed with the Secretary of State, testified he recorded no minutes of shareholder or board meetings and kept no corporate records.  Taylor testified that he kept handwritten notes on a legal pad of their weekly, and sometimes daily, meetings but later "lost" the notes.[26]

Moreover, there are inconsistencies in the identity of Great Southern's shareholders.  The documents filed with the Secretary of State initially listed Taylor as the sole shareholder, but Taylor insisted that he, Wilburn, and Jane Sears were shareholders from the date of its formation.  The documents, however, show that Wilburn and Jane Sears were added as shareholders of Great Southern on March 22, 2011, by an amendment to the Articles of Incorporation.  (Defs. Ex. 2).  Additionally, the Tax Returns identified Taylor's son, Grant Taylor, as a fourth shareholder.

As to the withdrawals in question, a total of $1,356,000.00 was withdrawn from the BB&T Account without any declaration of a dividend or other formal corporate act by Great Southern authorizing the transfers to the Defendants.  By draining these funds from Great Southern, the

---

[25] $2,862,000.00 = 3($832,000.00 + $122,000.00).

[26] The Fifth Circuit permits an adverse inference against the destroyer of evidence upon a showing of bad faith or bad conduct.  *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005).  At Trial, the Trustee did not ask the Court to draw an adverse inference from Taylor's "loss" of the notes, and scant evidence was presented at Trial regarding the circumstances surrounding the loss.

Hotel Investors treated Great Southern's money as their own, rather than as separate corporate property.  Finally, the Hotel Investors' abandonment of the Grand Station Hotel to Delta is another example of how the Hotel Investors disregarded the separate legal identity of Great Southern.

At Trial, the Hotel Investors relied on *Hill v. Fairfield Nursing & Rehabilitation Center, LLC*, 134 So. 3d 396 (Ala. 2013), in defense of the Trustee's veil-piercing claim.  In *Fairfield*, the Alabama Supreme Court ruled that an 85-year old resident of a nursing home presented enough evidence to survive summary judgment on her claim seeking to pierce the nursing home's corporate veil in a medical liability action.  The facts showed, *inter alia*, that the nursing home owned no real property and little personal property, had $25,000.00 in liability insurance, showed a loss on its balance sheet for the most recent year, and was owned by two limited liability companies, neither of which had any employees.  Noting that actual fraud is not necessarily a predicate for discarding the theory of separate corporate existence, the Alabama Supreme Court found that genuine issue of material facts existed precluding summary judgment as to whether the nursing home and various other defendants operated as a single business enterprise.

The Hotel Investors' reliance on *Fairfield* is misplaced.  In *Fairfield*, the Alabama Supreme Court determined that there were sufficient indicia of control by a parent company over the operation of its subsidiary corporation to preclude summary judgment.  Here, the Trustee is attempting to pierce the veil of Great Southern to reach the Hotel Investors and/or DJJ&J, which requires a different analysis.  Regardless, the Hotel Investors failed to articulate with any specificity how *Fairfield* supports their position.

### d.   Analysis

From the outset, the Hotel Investors never intended to operate Great Southern as a separate legal entity.  They formed Great Southern as a vehicle to hide the Defendants' investment in Delta

from the Commission. No corporate formalities were observed when $1,356,000.00 was withdrawn from the BB&T Account. The subterfuge was carried even further by payment of the funds to DJJ&J rather than directly to Jane Sears. The Hotel Investors treated the corporate assets of Great Southern as their own. These facts are a coalescence of subterfuge, fraud, and corporate disregard for which the Court finds that the corporate veil of Great Southern should be pierced to extend Great Southern's liability under the Agreed Judgment to the Hotel Investors.

With respect to DJJ&J, the Court's research has revealed no authority in Alabama that has expanded the remedy of veil-piercing to reach an individual who is neither a shareholder, an officer, nor a director of that corporate entity. *TLIG Maint. Servs., Inc. v. Fialkowski*, 218 So. 3d 1271, 1282-83 (Ala. Civ. App. 2016) (holding that the sole shareholder's boyfriend, who was not a director or officer of the corporation, could not be held jointly liable for the debts of the corporation under alter ego theory). The legal authorities cited by the parties in the PTO do not address this issue.

The evidence at Trial showed that the Hotel Investors (and possibly Grant Taylor) were the only shareholders of Great Southern. DJJ&J was never a shareholder of Great Southern and never exercised any managerial control over Great Southern. DJJ&J was merely an investment vehicle for Jane Sears and her children. The Court finds no legal basis for holding DJJ&J responsible for the Agreed Judgment entered against Great Southern and concludes that the Trustee's veil piercing claim against DJJ&J is not well taken and should be dismissed with prejudice.

### 4. Breach-of-Duty Claim

Under Alabama law, a corporate director or officer generally owes both a duty of care and a duty of loyalty to the corporation. *Davis v. Dorsey*, 495 F. Supp. 2d 1162, 1170 (M.D. Ala. 2007). The duty of loyalty is the "duty to act honestly for the corporation's best interest and to

avoid acts of self-dealing." *Id.* (citation & quotations omitted). "[A]n officer-director of a corporation owes a duty of managing the corporate affairs honestly and impartially and he may not achieve personal advantage, profit, or gain from his position." *Id.* (citing *Jefferson Cty. Truck Growers Ass'n v. Tanner*, 341 So. 2d 485, 487 (Ala. 1977)). The duty of care requires that corporate directors and officers discharge their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner they believe to be in the best interests of the corporation. *Id.* at 1177; *see* ALA. CODE § 10A-2-8.30(a).

Although Alabama recognizes a "business judgment rule"—an unwillingness by courts to second-guess the good-faith business decisions of directors and officers—the business-judgment rule requires that corporate management act in good faith and in the best interests of the corporation. *Davis*, 495 F. Supp. 2d at 1176 (citing *Roberts v. Ala. Power Co.*, 404 So. 2d 629, 631 (Ala. 1981)). The business-judgment rule does not operate to protect self-dealing by directors and officers or insulate them from liability for breach of the duty of care. *Id.*

In *Enstar Group, Inc. v. Grassgreen*, 812 F. Supp. 1562, 1570 (M.D. Ala. 1993), for example, the district court held that corporate directors and officers "must subordinate their personal interests to the interests of the corporation which they serve." *Id.* at 1574. There, the director of the corporation, who also served as its investment manager, collected and retained for his personal use hundreds of thousands of dollars in fees paid for commitments to invest the corporate funds. The district court affirmed awards of actual and punitive damages against the director because he "was paid money, and kept it personally, in exchange for investing, or at least committing to invest, the corporation's funds." *Id.* at 1570-71. Damages were awarded to the corporation in the amount of the funds that rightly belonged to the corporation, the profits the director personally made on these funds, and the salary and all compensation paid the director

while in breach of his duties.  *Id.* at 1575-76.  "The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation."  *Id.* at 1570 (citation & quotation omitted).

Similarly, in *Hensley v. Poole*, 910 So. 2d 96, 106 (Ala. 2005), the Alabama Supreme Court affirmed the findings of the trial court that the officer of a corporation, who also was its controlling shareholder and sole director, breached her fiduciary duty to the corporation by paying herself an excessive salary and excessive rent for a building she owned.  The Alabama Supreme Court found that such conduct constituted a clear breach of fiduciary duty which gave rise to damages recoverable by the corporation.[27]  *Id.*

The Court finds that the Hotel Investors, as corporate directors and officers of Great Southern, did not act honestly or in the best interest of Great Southern when they transferred $1,356,000.00, either directly or indirectly, into their own pockets without any corporate authorization or justification.  Their acts were at least comparable to those in *Enstar Group* and *Hensley*.  The Court concludes that the Hotel Investors are liable for the amounts they each received from the BB&T Account that rightfully belonged to Great Southern.  *Enstar Group*, 812 F. Supp. at 1576.  The Trustee is entitled to a judgment against each of the Hotel Investors in the amount of $452,000.00.

The Hotel Investors at Trial argued that there was a symbiotic relationship between the Grand Station Hotel and the Grand Station Casino, such that one could not survive without the other.  They were interlocked both physically and financially:  Patrons could not enter the Grand

---

[27] Likewise, Mississippi law holds that corporate directors and officers stand in a fiduciary relation to the corporation and owe duties to the corporation "to exercise the utmost good faith and loyalty in discharge of the corporate office [and] in dealing with corporate property; and to repay the corporation for any illegal diversions of corporate assets for which they may have participated."  *Hall v. Dillard*, 739 So. 2d 383, 386 (Miss. Ct. App. 1999) (citation & quotation omitted).

Station Casino except through the Grand Station Hotel, and most of the guests at the Grand Station Hotel stayed there to gamble at the Grand Station Casino.  In other words, the Hotel Investors maintained that their investment in Delta benefitted Great Southern, but they failed to explain how the return of a portion of their alleged investment benefitted either Delta or Great Southern.  The Court agrees that the financial success of Great Southern depended in large part on the success of the Grand Station Casino but disagrees that this co-dependency relieved the Hotel Investors of their duty of care and loyalty to Great Southern.

They also pointed out that the Project Investors agreed to return to the Hotel Investors a portion of their investment in Delta once Bally funded the loan.  The suggestion that the return of capital to the Hotel Investors was transparent and, therefore, made in good faith is belied by the evidence at Trial.[28]  In the Sources and Uses of Funds sent to the Commission on January 4, 2011, the loan from Bally is listed among the sources, but the return of capital to the Hotel Investors is not.  For this reason, McDaniel questioned the wire transfer of $1,357,635.00 to Great Southern in an email dated September 19, 2011.  Moreover, Delta did not return the funds directly to the individual Hotel Investors but to Great Southern and then recorded the transaction on its own books as a loan to Great Southern.  These actions conflict with the supposedly transparent agreement of the Project Investors to return a portion of the investment to the Hotel Investors.  Regardless, that the Project Investors agreed that the Hotel Investors, as opposed to the Casino Investors, could drain the BB&T Account is irrelevant as to the duty owed by the Hotel Investors to act in the best interests of Great Southern.

---

[28] As noted previously, Bally's lawsuit against Caldwell for fraud and false representation challenged the return of capital to Great Southern as an improper use of the loan proceeds.  *See supra* note 11.

Finally, the Hotel Investors suggested that the wire transfer of $1,357,635.00 to the BB&T Account was for convenience only and none of these funds belonged to Great Southern. The BB&T Account is titled in Great Southern's name; the wire transfer identified Great Southern as the beneficiary (Jt. Ex. 11); Delta recorded the transaction as a loan to Great Southern; and the Note obligated Great Southern to repay the loan. Given these facts, the Court rejects the suggestion that the funds in the BB&T Account did not belong to Great Southern.

## Conclusion

In the Complaint the Trustee alleges four causes of action: Count I: Piercing the Veil; Count II: Breach of Duty—Officers and Directors; Count III: Fraudulent Transfer; and Count IV: Violation of the Automatic Stay. The Court concludes the following with respect to each cause of action:

### Count I:  Piercing the Veil

The Court recommends to the District Court that a judgment be entered in favor of the Trustee piercing the corporate veil to extend Great Southern's liability under the Agreed Judgment to the Hotel Investors (or, more specifically, to Wilburn, Taylor, and Jane Sears but not DJJ&J). The Court also recommends that the Trustee's claim for piercing the corporate veil against DJJ&J be dismissed with prejudice.

### Count II:  Breach of Duty—Officers and Directors

The Court recommends to the District Court that a judgment be entered awarding the Trustee $452,000.00 against each of the Hotel Investors (or, more specifically, against Wilburn, Taylor and Jane Sears but not DJJ&J) for breach of the fiduciary duty owed Great Southern.

**Count III:  Fraudulent Transfer**

Pursuant to the Joint Stipulation, Count III should be dismissed with prejudice.

**Count IV:  Violation of the Automatic Stay**

Pursuant to 11 U.S.C. § 105(a) and the *Barton* doctrine, the Court finds that an injunction should be entered requiring the Defendants (including DJJ&J) to dismiss with prejudice the Trustee from the Warren County Action.  The Court also finds that a judgment should be entered in favor of the Trustee and against the Defendants, jointly and severally, in the sum of $17,147.42 for attorneys' fees and expenses incurred by the Trustee in defending the Warren County Action.  The Trustee also is entitled to recover against the Defendants (including DJJ&J) his reasonable attorneys' fees and expenses incurred in prosecuting Count IV.  The Trustee may submit a fee itemization and supporting affidavit as set forth in the Local Rules within fourteen (14) days of the date of this Opinion.  *See* Miss. Bankr. L.R. 7054-1(b)(2)(A)-(B).  Finally, the Trustee is entitled to punitive damages against the Defendants (including DJJ&J) for a willful violation of the automatic stay in the amount of $5,000.00.

With respect to the finality rule and the requirement of Rule 58 of the Federal Rules of Civil Procedure (as made applicable by Rule 9021 of the Federal Rules of Bankruptcy Procedure) that every judgment be set forth on a separate document, the Court makes the following findings:

1.   No final judgment will be entered by this Court on Count I:  Piercing the Veil or Count II:  Breach of Duty—Officers and Directors because they are non-core proceedings, and the Court must follow the procedures set forth in 28 U.S.C.

§ 157(c)(1).  Accordingly, after the time for filing an objection and/or response to the Court's proposed findings of fact and conclusions of law has expired, the Clerk will transmit a copy of this Opinion to the District Court for its *de novo* review and entry of a final judgment as to Count I:  Piercing the Veil and Count II:  Breach of Duty—Officers and Directors pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure.

      2.        No separate final judgment will be entered at this time by this Court on Count III:  Fraudulent Transfer and Count IV:  Violation of the Automatic Stay. After entry of an order determining the amount of attorneys' fees and expenses the Trustee is entitled to recover for prosecuting Count IV:  Violation of the Automatic Stay, the Court will enter a separate final judgment on both Count III:  Fraudulent Transfer[29] and Count IV:  Violation of the Automatic Stay.

##END OF OPINION AND PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW##

---

[29] To avoid confusion, the Court will not enter final judgment on Count III:  Fraudulent Transfer until final resolution of Count IV:  Violation of the Automatic Stay.